No. 20-2185

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

## CANAAN CHRISTIAN CHURCH, *et al.*

*Plaintiffs-Appellants,*

## v.

## MONTGOMERY COUNTY, MARYLAND, *et al.,*

*Defendants-Appellees.*

_____

## On Appeal From the United States District Court for
## the District of Maryland, Greenbelt Division
## (Hon. Theodore D. Chuang, United States District Judge)

_____

## BRIEF OF THE JEWISH COALITION FOR
## RELIGIOUS LIBERTY AND AGUDATH ISRAEL OF
## AMERICA AS *AMICI CURIAE* IN SUPPORT OF
## PLAINTIFFS-APPELLANTS AND REVERSAL

_____

Christopher Pagliarella
YALE LAW SCHOOL
FREE EXERCISE CLINIC
1919 Pennsylvania
Avenue, N.W., Suite 400
Washington, D.C. 20006

Gordon D. Todd
*Counsel of record*
Lucas W.E. Croslow
Matthew H. Simpson*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000

*Attorneys for Amici Curiae*

[additional information on inside cover]

\* Mr. Simpson is admitted only in Virginia and is practicing law in the District of Columbia pending admission to the D.C. Bar and under the supervision of principals of the firm who are members in good standing of the D.C. Bar.

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ............................................................ 1

INTRODUCTION ................................................................................... 3

ARGUMENT .......................................................................................... 8

  I.  PROPER APPLICATION OF RLUIPA IS UNIQUELY
     IMPORTANT FOR OBSERVANT JEWISH COMMUNITIES. ....... 8

 II.  RLUIPA MUST BE INTERPRETED ACCORDING
     TO ITS TERMS AND PURPOSE WITHOUT
     EXTRATEXTUAL LIMITS. ........................................................ 13

    A.  The district court's decision would render RLUIPA's equal terms
       provision superfluous and impotent. .......................................... 13

    B.  RLUIPA's text and this Court's precedents support Canaan
       Christian's substantial burden claim. ........................................ 19

    CONCLUSION .................................................................................. 27

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agudath Israel of Am.* v. *Cuomo,*
  983 F.3d 620 (2d Cir. 2020) ................................................................. 11

*Agudath Israel of Am.* v. *Cuomo,*
  No. 20A90, -- S. Ct. --, 2020 WL 6954120 (U.S. Nov. 25, 2020) ....... 2, 4

*Andon, LLC v. City of Newport News,*
  813 F.3d 510 (4th Cir. 2016).................................................... 21, 24, 26

*Bethel World Outreach Ministries* v. *Montgomery County Council,*
  706 F.3d 548 (4th Cir. 2013)........................................................ passim

*Canaan Christian Church* v. *Montgomery Cty.,*
  2020 WL 5849479 (D. Md. Sept. 30, 2020) ................................. passim

*Centro Familiar Cristiano Buenas Nuevas v. City of Yuma,*
  651 F.3d 1163 (9th Cir. 2011)............................................................. 18

*Espinoza* v. *Mont. Dep't of Revenue,*
  140 S. Ct. 2246 (2020) ......................................................................... 4

*Friends of Lubavitch* v. *Baltimore Cty.,*
  421 F. Supp. 3d 146 (D. Md. 2019)..................................................... 25

*Gagliardi* v. *City of Boca Raton,*
  No. 16-CV-80195-KAM, 2017 WL 5239570 (S.D. Fla. Mar. 28, 2017) ............................................................................................. 7, 12

*H & R Block E. Enterprises, Inc.* v. *Raskin,*
  591 F.3d 718 (4th Cir. 2010).............................................................. 19

*Hibbs* v. *Winn,*
  542 U.S. 88 (2004)............................................................................. 17

*Holt* v. *Hobbs,*
  574 U.S. 352 (2015) .......................................................................... 14

ii

*Hunt Valley Baptist Church, Inc.* v. *Balt. County*,
No. 17-cv-0804-SAG, 2020 WL 618662 (D. Md. Feb. 10, 2020) ......... 24

*Jesus Christ is the Answer Ministries* v. *Baltimore Cty.*,
915 F.3d 256 (4th Cir. 2019)................................................. 7, 21, 23, 24

*Khatib* v. *Cty. of Orange*,
603 F.3d 713 (9th Cir. 2010)......................................................... 13, 14

*Konikov* v. *Orange Cty.*,
410 F.3d 1317 (11th Cir. 2005).......................................................... 16

*Lighthouse Inst. for Evangelism, Inc.* v. *City of Long Branch*,
510 F.3d 253 (3d Cir. 2007) ............................................................... 16

*Midrash Sephardi, Inc.* v. *Town of Surfside*,
366 F.3d 1214, 1220–22 (11th Cir. 2004)........................................... 12

*OT, LLC* v. *Harford Cty.*,
No. 17-cv-02812-SAG, 2019 WL 5538057 (D. Md. Oct. 24, 2019)...... 24

*Perrin* v. *United States*,
444 U.S. 37 (1979) .......................................................................... 15

*Redeemed Christian Church of God (Victory Temple) Bowie* v.
*Prince George's Cty.*,
485 F. Supp. 3d 594 (D. Md. 2020)..................................................... 24

*Roman Catholic Bishop* v. *City of Springfield*,
724 F.3d 78 (1st Cir. 2013) ................................................................ 22

*Roman Catholic Diocese of Brooklyn* v. *Cuomo*,
141 S. Ct. 63 (2020) (per curiam) ...................................................... 11

*Shelley* v. *Kraemer*,
334 U.S. 1 (1948) ............................................................................... 9

*Thai Meditation Ass'n of Ala., Inc.* v. *City of Mobile*,
980 F.3d 821 (11th Cir. 2020)............................................................ 22

*Tree of Life Christian Sch.* v. *City of Upper Arlington*,
905 F.3d 357 (6th Cir. 2018)................................................... 16, 17, 18

*United States* v. *Cty. of Culpepper*,
245 F. Supp. 3d 758 (W.D. Va. 2017) ..................................... 14, 24, 25

*Westchester Day Sch.* v. *Vill. of Mamaroneck*,
504 F.3d 338 (2d Cir. 2007) ........................................................ 7, 11

*Whitehouse* v. *Johnson*,
No. 1:10-CV-1175, 2011 WL 5843622 (E.D. Va. Nov. 18, 2011) ........ 14

*Young Israel of Tampa* v. *Hillsborough Regional Transit
Authority*,
No. 8:21-cv-00294 (M.D. Fla. filed Feb. 5, 2021) ................................ 1

**STATUTES**

Religious Land Use and Institutionalized Persons Act of 2000,
Pub. L. No. 106-274, 114 Stat. 803 (codified at 42 U.S.C. §
2000cc *et seq.*) ................................................................ passim

**REGULATIONS**

Mo. Exec. Order No. 44 (Oct. 27, 1838) ..................................... 3

**OTHER AUTHORITIES**

46 Cong. Rec. 16,698 (2000) ....................................................... 4

144 Cong. Rec. 100 (daily ed. July 27, 2000) .......................................... 15

8 Joseph M. Perillo & Helen Hadjiyannakis Bender, *Corbin on
Contracts* (1993) ................................................................. 25

Andrew Willis, Note, *Zoning on Holy Ground: Developing a
Coherent Factor-Based Analysis for RLUIPA's Substantial
Burden Provision*, 95 Chi.-Kent L. Rev. 425, 439–40 (2020) ............ 22

Catherine Silva, *Racial Restrictive Covenants History: Enforcing
Neighborhood Segregation in Seattle*, Seattle C.R. & Lab. Hist.
Project (2009), http://bit.ly/2O3e6DJ ..................................... 9

iv

Douglas Laycock & Luke W. Goodrich, *RLUIPA: Necessary, Modest, and Under-Enforced*, 39 Fordham Urb. L.J. 1021, 1066 (2012) .................................................................................. 18

Eli Steinberg, *The Re-Ghettoizing of the Jews*, Wash. Exam'r (Jan. 23, 2020), http://washex.am/2OiGDFg ............................................... 10

Garrett Power, *The Residential Segregation of Baltimore's Jews*, Generations, Fall 1996, https://bit.ly/3uUIdxR .................................... 9

James Jay Carafano & Sara A. Carter, Anti-Semitism Is All of Our Problem, Heritage Found. (Jan. 5, 2021), http://herit.ag/3qgLUuc ........................................................................ 9

Janet Maslin, *The Exodus From Paducah, 1862*, N.Y. Times (Apr. 4, 2012) (reviewing Jonathan D. Sarna, *When General Grant Expelled the Jews* (2012)), http://nyti.ms/2OnVLBn ............................ 3

Liam Stack, *Backlash Grows in Orthodox Jewish Areas Over Virus Crackdown by Cuomo*, N.Y. Times (Oct. 7, 2020) ................................ 10

Opinion, *Orthodox Jews Face Collateral Damage From Unbalanced COVID-19 Measures*, Religion News Serv. (July 10, 2020), http://bit.ly/38ceB5n ................................................................. 10

*Orthodox Jews, Files Court Brief Supporting Jewish Students*, Religious Freedom Inst. (Oct. 23, 2020), http://bit.ly/3uTAujv .......... 10

*Some Groups, Residents Say Gov. Cuomo Has Taken Criticism of Orthodox Jewish COVID-19 Noncompliance Too Far,* CBS N.Y. (Oct. 15, 2020), http://cbsloc.al/30cwXyN ................................ 11, 12, 13

# INTEREST OF *AMICI CURIAE*[1]

The Jewish Coalition for Religious Liberty (JCRL) is a cross-denom-inational association of rabbis, lawyers, and professionals who practice Judaism and are committed to religious liberty. As adherents of a minor-ity religion, JCRL's members have a strong interest in ensuring that re-ligious liberty rights are protected. The group aims to protect the ability of all Americans to freely practice their faith and foster cooperation be-tween Jews and other faith communities. To that end, JCRL's leaders have filed amicus briefs in federal and state courts, published op-eds in prominent news outlets, and established an extensive volunteer network to spur public statements and action on religious liberty issues by Jewish communal leadership. JCRL has also served as plaintiff's counsel in liti-gation addressing the free exercise and free speech rights of Jewish indi-viduals and organizations. *See, e.g.*, *Young Israel of Tampa v. Hills-borough Regional Transit Authority*, No. 8:21-cv-00294 (M.D. Fla. filed Feb. 5, 2021) (challenge to restrictions on religious speech in advertising).

---

[1] This brief has been prepared in part by a clinic operated by Yale Law School, but does not purport to present the School's institutional views, if any.

Agudath Israel of America (Agudath Israel), founded in 1922, is a national grassroots Orthodox Jewish organization. Among its many functions and activities, Agudath Israel articulates and advances the position of the Orthodox Jewish community on a broad range of legal issues affecting religious rights and liberties in the United States. Agudath Israel regularly intervenes at all levels of government—federal, state, and local; legislative, administrative, and judicial (including through the submission of or participation in *amicus curiae* briefs) to advocate for and protect the interests of the Orthodox Jewish community in the United States in particular and religious liberty in general. *See, e.g.*, *Agudath Israel of Am. v. Cuomo*, No. 20A90, -- S. Ct. --, <u>2020 WL 6954120</u> (U.S. Nov. 25, 2020) (obtaining grant of injunctive relief in Free Exercise case). Agudath Israel advocated for the passage of the law at issue in this case, the Religious Land Use and Institutionalized Persons Act (RLUIPA).

In light of their organizational purposes, *amici* share an interest in preserving RLUIPA's protections, and frequently appear as *amici* to provide a broader perspective on RLUIPA, including the protections the law affords the Jewish community. *Amici* tender this brief to provide that context, and offer a different perspective as to why the district court was

2

mistaken in its interpretation of the equal-terms and substantial-burden provisions of RLUIPA.

## INTRODUCTION

From before the Founding, the United States has offered succor for adherents of uncommon or disfavored faiths. From Puritans to Catholics, from Jews and Muslims to the Ukrainian Orthodox and Amish, our nation has been a haven from religious persecution. In the United States, practitioners of diverse faiths are not merely "tolerated," but welcomed as members of the community and fellow citizens.

To be sure, we have at times fallen short of our ideals of religious freedom. Sometimes those deviations have been brazen, such as the military attempt to expel Jewish persons from Kentucky, or Missouri's "Extermination Order" directing that "Mormons must be treated as enemies, and must be exterminated or driven from the state." Janet Maslin, *The Exodus From Paducah, 1862*, N.Y. Times (Apr. 4, 2012) (reviewing Jonathan D. Sarna, *When General Grant Expelled the Jews* (2012)), http://nyti.ms/2OnVLBn; Mo. Exec. Order No. 44 (Oct. 27, 1838).

Government targeting of religious communities for discriminatory treatment lives on in recent memory. For example, Jewish persons were

targeted for "selective prosecution" under New Deal health laws partly to strengthen support for those laws, even where their practices posed no health danger. See Brief of the Muslim Public Affairs Council et al. at 5–6, *Agudath Israel of Am.* v. *Cuomo*, No. 20A90 (U.S. Nov. 17, 2020) (collecting sources). And indeed, the Supreme Court has recognized that vestiges of *de jure* religious "bigotry" have persisted into the present. *See Espinoza* v. *Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2259 (2020).

Congress has recognized that governments at all levels have fallen short of our commitments to religious minorities, and that discrimination may deny religious individuals and communities the ability to live and worship consistently with their faith. See 46 Cong. Rec. 16,698 (2000) (joint statement of Senators Orrin Hatch and Ted Kennedy). To help square American practices with American ideals, Congress unanimously passed, and President Clinton signed, the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), Pub. L. No. 106-274, 114 Stat. 803 (codified at 42 U.S.C. § 2000cc *et seq.*).

RLUIPA subjects any land use regulation imposing a substantial burden on religious exercise to strict scrutiny, permitting application of the regulation only if "the government demonstrates that imposition of

the burden on that person, assembly, or institution (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1). RLUIPA separately provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." *Id.* § 2000cc(b)(1) (the "Equal Terms" provision).

The growing body of worshipers at Canaan Christian Church contracted to purchase rural land in Montgomery County, planning to build a place of worship that could hold their vibrant and expanding community. Canaan Christian found land that was both properly zoned for a place of worship and large enough to provide for its needs. However, after entering into a contract of sale, the county government denied a permissive zoning variance relating to water and sewage service for the parcel, making the parcel effectively unusable by the Church—even though religious use of the parcel is an of-right use of the land.

In rejecting Canaan Christian's RLUIPA challenge, the district court imposed two requirements on the Plaintiffs that are not consistent

5

with RLUIPA or this Court's precedents. First, the district court found the Plaintiffs' equal-terms claim could not proceed so long as Defendants could offer *some* regulatory distinction between the Plaintiffs' denied (religious) land use, and comparable secular land uses previously permitted. And second, the district court held that RLUIPA substantial burden claims are *per se* barred if a plaintiff should have expected its proposal to be rejected, and that such an expectation may be lacking even if the zoning code authorizes religious use of a given parcel *by right*.

The decision below, if affirmed, would work two harms on RLUIPA's protections for disfavored faith communities. *First*, barring religious institutions from bringing equal-terms claims simply because the government can offer a fig leaf of a difference between religious and non-religious land uses would cut off valid claims that should be allowed under RLUIPA's plain text. *Second*, adopting the district court's transformation of this Circuit's reasonable expectation inquiry—already more restrictive than in most other circuits—would invite pretextual or trivial land use denials. By ignoring the substantial weight this Court's precedent gives the presence of by-right zoning in the analysis, and instead elevating factors unrelated to "who is responsible for the impediment,"

6

the district court (however accidentally) provided a blueprint for future unjust denials. *Jesus Christ is the Answer Ministries v. Baltimore Cty.*, 915 F.3d 256, 261 (4th Cir. 2019).

Ensuring proper application of RLUIPA is crucial for all minority religious groups, but especially for Jewish communities. These are not academic or single-case issues. In recent years, local governments have increasingly relied on arguably pretextual interests in controlling traffic, maintaining tax revenue, and preserving aesthetic interests as justifications for denying zoning approvals and building permits, effectively blocking Jews from building schools and synagogues. See *Westchester Day Sch.* v. *Vill. of Mamaroneck*, 504 F.3d 338, 351–52 (2d Cir. 2007) ("traffic" and "parking" concerns had no "basis in fact" in connection with actual school proposal); *Gagliardi* v. *City of Boca Raton*, No. 16-CV-80195-KAM, 2017 WL 5239570, at *1–3 (S.D. Fla. Mar. 28, 2017) ("religious animus" mixed with "desire to protect the residential quality" of neighborhood in attempt to bar construction of a Chabad religious center), *aff'd sub nom. Gagliardi* v. *TJCV Land Tr.*, 889 F.3d 728 (11th Cir. 2018). The approach taken by the district court would render RLUIPA impotent against misguided and pretextual land use regulations that have the

effect or even the purpose of disfavoring the practice of Judaism and other minority faiths.

The judgment below should be vacated and this case remanded with instructions to apply this Court's precedents and to properly weigh the competing asserted interests as RLUIPA requires.

## ARGUMENT

## I.   PROPER APPLICATION OF RLUIPA IS UNIQUELY IM- PORTANT FOR OBSERVANT JEWISH COMMUNITIES.

The United States has served as a haven for Jewish adherents fleeing persecution since the Founding. George Washington's 1790 address to the Newport Hebrew Congregation promised that "the Children of the Stock of Abraham" would—in the words of the scriptures—"sit in safety under his own vine and figtree, and there shall be none to make him afraid."[2] Guided by its Constitution and principles, America today remains one of the freest and most welcoming places in the world to practice the Jewish faith.

---

[2] President Washington to the Hebrew Congregation of Newport (Aug. 18, 1790), *in* 6 *The Papers of George Washington: Presidential Series, July-November 1790*, 286, 286 n.1 (Dorothy Twohig et al. eds., 1986).

But even the United States has not been entirely free from ugly episodes of Anti-Semitism. Suspicion of uncommon or unfamiliar practices has often led to discrimination against Jewish organizations, traditions, and individuals. Discrimination against and burdening of Jewish religious practice is often concealed in generalized expressions of concern about traffic conditions, environmental protection, property values, and other government interests.

Blatant acts of targeted harassment, vandalism and assault against Jews still occur, and have unfortunately increased in recent years. James Jay Carafano & Sara A. Carter, Anti-Semitism Is All of Our Problem, Heritage Found. (Jan. 5, 2021), http://herit.ag/3qgLUuc. Subtler forms of anti-Semitism were present in the twentieth century as well, including attempts to exclude Jews through restrictive city covenants. Until the Supreme Court intervened in 1948, many cities, from Seattle to Baltimore, enforced restrictive covenants, many of which were "directed against … Jews." *Shelley v. Kraemer*, 334 U.S. 1, 21 n.26 (1948); see, *e.g.*, Catherine Silva, *Racial Restrictive Covenants History: Enforcing Neighborhood Segregation in Seattle*, Seattle C.R. & Lab. Hist. Project (2009), http://bit.ly/2O3e6DJ; Garrett Power, *The Residential*

*Segregation of Baltimore's Jews*, Generations, Fall 1996, at 5, https://bit.ly/3uUIdxR.

Though such restrictive covenants may no longer be enforced, for some the impulse to exclude has not disappeared. Just five years ago, the town of Toms River, New Jersey saw anti-Semitic graffiti scratched into a playground. Soon after, the town's mayor referred to an "invasion" of Jews into the city, and residents responded by openly resisting selling their homes to Jews. See Eli Steinberg, *The Re-Ghettoizing of the Jews*, Wash. Exam'r (Jan. 23, 2020), http://washex.am/2OiGDFg.

During the COVID-19 pandemic, state and local government leaders have "[s]ingl[ed] out" Jewish communities while restricting, in the name of public health, the ability of religious adherents to gather for worship. See Brett Harvey & Howard Slugh, Opinion, *Orthodox Jews Face Collateral Damage From Unbalanced COVID-19 Measures*, Religion News Serv. (July 10, 2020), http://bit.ly/38ceB5n; see also Liam Stack, *Backlash Grows in Orthodox Jewish Areas Over Virus Crackdown by Cuomo*, N.Y. Times (Oct. 7, 2020), http://nyti.ms/30fJm4W; Ismail Royer, *RFI Urges Cuomo to Stop "Scapegoating" Orthodox Jews, Files Court Brief Supporting Jewish Students*, Religious Freedom Inst. (Oct. 23,

2020), http://bit.ly/3uTAujv. Most overtly, New York Governor Cuomo singled out Orthodox Jews for restrictive treatment with his "cluster zones" initiative. See *Some Groups, Residents Say Gov. Cuomo Has Taken Criticism of Orthodox Jewish COVID-19 Noncompliance Too Far*, CBS N.Y. (Oct. 15, 2020), http://cbsloc.al/30cwXyN. The Supreme Court granted injunctive relief from those burdensome, religiously discriminatory restrictions, after which the Second Circuit unanimously decided in favor of the Jewish plaintiffs, including *amici*. See *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 141 S. Ct. 63 (2020) (per curiam); *Agudath Israel of Am.* v. *Cuomo*, 983 F.3d 620 (2d Cir. 2020).

At other times, bigotry or insensitivity to religious practice has been couched in neutral language. Traffic safety, environmental protection, property values, and other generally important interests (and, in some cases, transparently unimportant interests) serve as pretexts to justify burdening Jewish practitioners when those interests are not actually served by the proposed burdens. For example, in *Westchester Day School*, a zoning board initially approved but then rescinded a zoning modification for a Jewish school that wished to construct a new building on its existing campus. 504 F.3d at 345–46. The district court "surmised that

11

the [zoning] application was in fact denied because . . . [of] the public op-position of the small but influential group of neighbors who were against the school's expansion plans," not because of "the effect the project would have on traffic and concerns with respect to parking and the intensity of use." *Id.* at 346. Similarly, in *Gagliardi v. City of Boca Raton*, the Chabad of East Boca Raton faced local opposition to their presence which was "motivated by religious animus." 2017 WL 5239570, at *1, *aff'd*, 889 F.3d 728. In response to negotiations between the City and the Chabad to ac-commodate the latter's religious practices, residents of the City sued, ar-guing that they personally would suffer as the result of "traffic, difficul-ties in access for emergency vehicles, and a change in the character of the area." *Id.* at 731. And again, in *Midrash Sephardi, Inc. v. Town of Surf-side*, Jewish synagogues were prohibited from renting space in a city's business district which allowed private clubs, lodges, and theatres but banned synagogues. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1220–22 (11th Cir. 2004). The town argued that the synagogue was not treated unequally because the synagogues could not be compared to the approved secular organizations in the business district. *Id.* at 1230. The Eleventh Circuit disagreed, emphasizing that "the express

12

provisions of RLUIPA … require a direct and narrow focus," and holding that the Jewish synagogue had been illegally barred from operating in the town's business district. *See id.* at 1230–31.

In all of these instances, the proper application of RLUIPA was critical to protecting the rights of faithful adherents to Judaism when their communities would otherwise have discriminated against or prohibited their rights to religious observance. The converse danger is present in this case: the precedent the district court's decision would establish would inevitably damage the ability of Jewish organizations and members of other minority faiths to vindicate their religious freedoms.

## II.   RLUIPA MUST BE INTERPRETED ACCORDING TO ITS TERMS AND PURPOSE WITHOUT EXTRATEXTUAL LIMITS.

### A.   The district court's decision would render RLUIPA's equal terms provision superfluous and impotent.

Congress mandated that RLUIPA "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [its] terms . . . and the Constitution." 42 U.S.C. § 2000cc-3(g). Statutes that include express rules for construing their terms are "very few," *see Khatib v. Cty. of Orange*, 603 F.3d 713, 718 (9th Cir. 2010) (Kozinski, J., dissenting), *superseded on reh'g en banc*, 639 F.3d 838 (9th Cir. 2011),

13

but "when Congress goes to the trouble of telling [courts] how to construe a statute, and uses such phrases as 'broad protection' and 'the maximum extent permitted,' [courts] need to pay close attention and do as Congress commands." *Id.* (addressing RLUIPA).

Accordingly, the Supreme Court has emphasized that RLUIPA was intended "to provide very broad protection for religious liberty," and that "[s]everal provisions of RLUIPA"—including its "broad protection" rule of construction—"underscore its expansive protection." *Holt v. Hobbs*, <u>574 U.S. 352, 356–58</u> (2015) (citations omitted). Courts in this Circuit have found that the "broad protection" provision "supplies an internal canon of construction: When the interpretation of a RLUIPA term is disputed, favor the religious claimant to the greatest extent possible." *United States v. Cty. of Culpepper*, <u>245 F. Supp. 3d 758, 766</u>–67 (W.D. Va. 2017) (citing, e.g., *Lovelace v. Lee*, <u>472 F.3d 174, 186</u> (4th Cir. 2006)); *see Whitehouse v. Johnson*, No. 1:10-CV-1175, <u>2011 WL 5843622</u>, at *3 (E.D. Va. Nov. 18, 2011) (applying RLUIPA's "clear demand for broad construction").

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary,

14

contemporary, common meaning." *Perrin v. United States*, <u>444 U.S. 37, 42</u> (1979) (internal citation omitted). RLUIPA plainly states that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." <u>42 U.S.C. § 2000cc(b)(1)</u>. Congress was especially wary of religious institutions being denied the right to build for "vague and universally applicable reasons [such] as traffic, aesthetics, or 'not [being] consistent with the city's land use plan.'" 144 Cong. Rec. 100, S7774 (daily ed. July 27, 2000) (Joint Statement of Senator Hatch and Senator Kennedy).

Unfortunately, the district court strayed far beyond the simple text of RLUIPA, adding a requirement that the Plaintiffs identify a specific comparator that was treated more favorably then Canaan Christian *and* was "similarly situated with regard to the regulation at issue." *Canaan Christian Church v. Montgomery Cty.*, <u>2020 WL 5849479</u>, at \*19 (D. Md. Sept. 30, 2020) (quoting *Tree of Life Christian Sch. v. City of Upper Arlington*, <u>905 F.3d 357, 368</u>–69 (6th Cir. 2018)) (emphasis omitted). The district court looked to cases from other circuits to determine "the

15

relevant standard," which, it concluded, "is that a comparator must be similar[ly] situated as to the relevant zoning purpose or criteria."[3] *Id.*

The district court's adoption of the "similarly situated" analysis cuts against both the language and intent of RLUIPA. As the Eleventh Circuit has explained, Congress consciously decided *not* to adopt the "similarly situated" standard, which is a familiar feature in other areas of law. *See Konikov v. Orange Cty.*, 410 F.3d 1317, 1324 (11th Cir. 2005) ("For purposes of a RLUIPA equal terms challenge, the standard for determining whether it is proper to compare a religious group to a nonreligious group is not whether one is 'similarly situated' to the other, as in our familiar equal protection jurisprudence."); *accord Tree of Life*, 905 F.3d at 387 (Thapar, J., dissenting) ("Congress knew about 'similarly situated'

---

[3] Circuits that do employ a "similarly situated" test under RLUIPA's equal-terms provision generally ask whether the Plaintiff was similarly situated to a comparator in terms of either the *purpose* or the *criteria* of the zoning restriction at issue. *See, e.g.*, *Tree of Life*, 905 F.3d at 368–69 (requiring an analysis of the "legitimate zoning criteria"); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 270 (3d Cir. 2007) (requiring an analysis of "the interests the regulation seeks to advance"). The district court did not clearly adopt either the zoning purpose or the zoning criteria test—both of which are foreign to this Circuit—though as Plaintiffs-Appellants discuss, it appeared to rely on potentially irrelevant criteria. Canaan Br. 51–55.

16

standards from the Equal Protection context and chose *not* to incorporate them into RLUIPA." (emphasis in original)).

And that makes good sense in the context of the statute. Otherwise, the "similarly situated" requirement would quickly result in RLUIPA's nondiscrimination and equal-treatment provisions overlapping completely. *See Tree of Life*, 905 F.3d at 387 (Thapar, J., dissenting) (applying anti-discrimination principles to the "Equal Terms provision would make the separate Antidiscrimination provision superfluous."). "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citation omitted).

RLUIPA should be interpreted to prevent governments from defeating equal terms claims through cleverly placing religious and secular interests in different categories. The result of such gamesmanship is "heads the city wins, tails [the plaintiff] loses." *See Tree of Life*, 905 F.3d at 386 (Thapar, J., dissenting). The district court's "similarly situated" test would make it virtually impossible for a religious institution to bring a successful claim under the "equal terms provision"—already "under enforced" due to the way some courts have "sharply narrowed" "what should

17

be a clear, bright-line rule." Douglas Laycock & Luke W. Goodrich, *RLUIPA: Necessary, Modest, and Under-Enforced*, 39 Fordham Urb. L.J. 1021, 1066 (2012).

When similarly situated comparators are defined narrowly, such as "a permitted land use that would generate a comparably small amount of revenue for the City," *Tree of Life*, 905 F.3d at 376 (Thapar, J., dissenting), it effectively gives the government "grounds to exclude any new church from any jurisdiction in the country." Laycock & Goodrich, *supra*, at 1036. Congress imposed no such burden on religious claimants, and nor should this Court. *See Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1173 (9th Cir. 2011) ("The burden is not on the [religious organization] to show a similarly situated secular assembly, but on the city to show that the treatment . . . should not be deemed unequal, where it appears to be unequal on the face of the ordinance.").

This Court should therefore follow the plain text of RLUIPA in guiding the elements of an equal terms claim under the Act. Plaintiffs-Appellants have advocated a more modest view tailored to their needs in this specific case. But "a court is not required 'to accept what in effect [is] a stipulation on a question of law." *H & R Block E. Enterprises, Inc. v.*

*Raskin*, 591 F.3d 718, 723 n.10 (4th Cir. 2010) (quoting *Nat'l Bank of Or. v. Indep. Ins. Agents of Am.*, *Inc.*, 508 U.S. 439, 448 (1993)). And a text-based rule will better avoid the "significant amount of uncertainty"—and deterring of legitimate RLUIPA claims—that extra-textual requirements have wrought. Laycock & Goodrich, *supra,* at 1066.

## B. RLUIPA's text and this Court's precedents support Canaan Christian's substantial burden claim.

This Court has explained that RLUIPA's statutory language and structure evidence the statute's intent to "do more than merely codify First Amendment jurisprudence." *Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548, 556 (4th Cir. 2013). Rather, RLUIPA is crafted to allow religious minorities their day in court when the government burdens their religious freedoms. A plaintiff can pursue a substantial burden claim if the government "impose[d] or implement[ed] a land use regulation in a manner that imposes a substantial burden on the religious exercise of … a religious assembly or institution." 42 U.S.C. § 2000cc(a)(1). Such regulations must be the "least restrictive means" of furthering a compelling governmental interest. *Id.*

This Circuit has sometimes inquired into whether a religious institution could "reasonably expect to build a church" when assessing

19

whether a substantial burden has been placed on that institution. *Bethel*, 706 F.3d at 558 (rejecting county's claim that it had proven no reasonable expectation where it "permitted churches" in the relevant area). However, the court below made two significant errors in applying this inquiry to bar the RLUIPA claim here. First, the district court converted the reasonable-expectation consideration into an absolute prerequisite to suit. That broke from other circuits with no textual basis or mandate in this Circuit's precedent. Second, within the reasonable-expectation analysis, the district court placed legal weight on different factors in a manner contrary to this Court's guidance in *Bethel* and like cases.

***Reasonable Expectation as Threshold Requirement.*** The district court's treatment of the reasonable expectation test as a threshold requirement was a break from the precedent of this Circuit, as well as from the practice of other circuits. Plaintiffs need not have a reasonable expectation of land use in order to sustain a RLUIPA substantial burden claim, and this Court has never so held. Yet the district court concluded that "the lack of a reasonable expectation is alone sufficient to defeat Plaintiffs' RLUIPA Substantial Burden claim." *Canaan Christian*, 2020 WL 5849479, at *18.

The district court supported this conclusion by referencing a previous case that was dismissed "on the finding that there was no reasonable expectation." *Andon, LLC v. City of Newport News*, <u>813 F.3d 510</u> (4th Cir. 2016). But *Andon* expressly avoided an absolute rule, stating only that a "*self-imposed* hardship *generally* will not support a substantial burden claim under RLUIPA." *Id.* at 516 (emphasis added) (ruling only "under these circumstances"). That equivocal statement did not create a threshold "reasonable expectation" test for all RLUIPA claims, which would have been a stark departure from this Court's precedents. Indeed, three years later in *Jesus Christ is the Answer*, this Court likewise stated that a "reasonable expectation" was among the "consider[ations]" for a broader question as to "who is responsible for the impediment" a religious organization faces. <u>915 F.3d at 261</u>. Thus, the district court broke from precedent in failing to adequately consider the magnitude of the plaintiffs' burden, and erred in treating the reasonable expectation test as dispositive.

The district court's approach was also out of step with the practice in other circuits. Some, like the First Circuit, do not even consider reasonable expectation as a factor in determining substantial burden, but

look instead for evidence of religious targeting, the disparate impact of facially neutral policies, and arbitrary, capricious, or unlawful regulations in determining whether a land regulation imposes a substantial burden on religious exercise. *See Roman Catholic Bishop v. City of Springfield*, 724 F.3d 78, 96–97 (1st Cir. 2013) (emphasizing this is not an "exhaustive list" of circumstances under which a substantial burden may arise, only examples). Other circuits, including the Sixth and Eleventh, treat the presence of a reasonable expectation as only one of several "factors" which a court may wish to consider in determining the validity of a substantial burden claim. *See* Andrew Willis, Note, *Zoning on Holy Ground: Developing a Coherent Factor-Based Analysis for RLUIPA's Substantial Burden Provision*, 95 Chi.-Kent L. Rev. 425, 439–40 (2020); *see also Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 831 (11th Cir. 2020) (listing six different "factors" to be "consider[ed], among others" regarding a substantial burden in the land-use context, with "reasonable expectation" a part of one). No circuit—including this Circuit, based on a fair reading of its precedents—appears to consider reasonable expectation of land use a necessary threshold requirement for

a RLUIPA substantial burden claim. And nothing in RLUIPA's plain text recommends creating a circuit split on this question.

**Weight Given Reasonable Expectation Factors.** Moreover, even if a reasonable expectation of land use were a threshold requirement, the court below wrongly concluded that a reasonable expectation was lacking in this case. In trying to apply a "flexible test involving consideration of all the relevant circumstances," *Canaan Christian*, 2020 WL 5849479, at *16, the district court underweighted a key factor that favored Canaan Christian and overweighted two factors that did not.

The district court gave too little weight to the fact that Canaan Christian's parcel was zoned, as of right, for religious use. This Circuit has previously treated permissive zoning for churches as sufficient to establish a material issue of triable fact on whether a RLUIPA reasonable expectation existed. *See Bethel*, 706 F.3d at 558 (permissive zoning created a "question of material fact as to whether [plaintiffs] had a reasonable expectation of being able to build a church"). Likewise, in *Jesus Christ is the Answer*, this Court emphasized that churches being "permitted as of right" in the relevant zone "especially" demonstrated the plaintiff's reasonable expectation. 915 F.3d at 261. By contrast, in *Andon*, "the

23

property was not a permitted site for a community facility such as a church[.]" 813 F.3d at 515.

Until now, neither this Court nor any district court in this Circuit has ever held that there was not at least a material issue of triable fact as to whether RLUIPA plaintiffs had a reasonable expectation to build a church when the land was permissibly zoned for churches. *See Jesus Christ is the Answer*, 915 F.3d at 261; *Bethel*, 706 F.3d at 558; *Redeemed Christian Church of God (Victory Temple) Bowie v. Prince George's Cty.*, 485 F. Supp. 3d 594, 605 (D. Md. 2020) ("Victory Temple had a reasonable expectation of religious land use. The Mount Oak Road property is zoned R-E and a church is a use by right."), *appeal filed*, No. 20-2125 (4th Cir.); *Hunt Valley Baptist Church, Inc. v. Balt. County*, No. 17-cv-0804-SAG, 2020 WL 618662, at *14 (D. Md. Feb. 10, 2020); *OT, LLC v. Harford Cty.*, No. 17-cv-02812-SAG, 2019 WL 5538057, at *8 (D. Md. Oct. 24, 2019); *United States v. Cty. of Culpeper*, 245 F. Supp. 3d 758, 770 n.8 (W.D. Va. 2017); *cf. Friends of Lubavitch v. Baltimore Cty.*, 421 F. Supp. 3d 146,

24

<u>164</u>-65 (D. Md. 2019) (concluding that proposed use did not qualify as house of worship that would be "permitted as of right").[4]

In place of the proper weight given to by-right zoning, the district court also gave too much weight to factors that supposedly cut against Canaan Christian's reasonable expectation, such as: (1) the contract for the purchase of the parcel containing a zoning contingency and (2) the county's past denials (in the district court's telling) of zoning permits for religious land uses.

Contractual contingency provisions should carry no weight in de-termining a religious institution's reasonable expectation in using land for religious purposes, because both prudence and common practice re-quire parties to plan for unlikely but damaging contingencies. *See* 8 Jo-seph M. Perillo & Helen Hadjiyannakis Bender, *Corbin on Con-tracts* § 30.1 (1993). Indeed this Court, commenting on a church's offer to

---

[4] In some of these cases, permissible zoning was sufficient on its own to establish a reasonable expectation. *See Cty. of Culpeper*, <u>245 F. Supp. 3d at 770</u> n.8 (concluding that there was a reasonable expectation because "the zoning map permits religious uses on the Property as of right."); *see also Friends of Lubavitch*, <u>421 F. Supp. 3d at 165</u> (finding no question as to whether the plaintiffs had a reasonable expectation to build a syna-gogue on the desired parcel because such a structure was permitted "as of right" while rejecting the plaintiff's claim of substantial burden on other grounds).

purchase land for religious use, has explained that "modern zoning practices are such that landowners are rarely *guaranteed* approvals." *Bethel*, 706 F.3d at 558. While *Andon* discussed the plaintiffs having adopted a "contingency provision in the lease," the core issue was that the plaintiffs were wholly aware that "the property was not a permitted site for a community facility such as a church"—not simply aware of a possible or even likely denial. 813 F.3d at 515.

Nor should a local government's history of denying religious land use applications provide a basis for denying future applications, as the district court suggested. *Canaan Christian*, 2020 WL 5849479 at *14 ("the Landowner Plaintiffs' prior history of attempting and failing to secure approval for sewer extensions to the Property made any expectation of approval of the Canaan [water and sewer category change requests] unreasonable"). Setting aside Plaintiffs' arguments as to why the history did not show consistent denials under the same policy, Canaan Br. 42–45, there is a more basic problem with this rule: To approve of this circular logic would create a perverse incentive for governments to reflexively deny religious land uses, as a shield against future RLUIPA claims. This Court should make clear that a history of past denials of religious use,

without more, does not support barring the courthouse doors to meritorious RLUIPA claims.

## CONCLUSION

RLUIPA is an important protection for religious minorities and the Jewish community in particular. However this case is resolved, the Court should not approve the unduly harsh and atextual standards adopted by the district court. Instead, this Court should vacate the district court's ruling and remand for the court to apply a proper reading of RLUIPA.

Date: March 15, 2021                Respectfully Submitted,

                                    /s/ Gordon D. Todd
                                    Gordon D. Todd
                                     *Counsel of record*
                                    Lucas W.E. Croslow
                                    Matthew H. Simpson*
                                    SIDLEY AUSTIN LLP
                                    1501 K Street, N.W.
                                    Washington, DC 20005
                                    Telephone: (202) 736-8000

                                    Christopher Pagliarella
                                    YALE LAW SCHOOL
                                     FREE EXERCISE CLINIC
                                    1919 Pennsylvania
                                     Avenue, N.W., Suite 400
                                    Washington, D.C. 20006

                                    *Attorneys for Amici Curiae the*
                                    *Jewish Coalition for Religious*

*Liberty and Agudath Israel of America*

* Mr. Simpson is admitted only in Virginia and is practicing law in the District of Columbia pending admission to the D.C. Bar and under the supervision of principals of the firm who are members in good standing of the D.C. Bar.

28

## CERTIFICATE OF COMPLIANCE

This brief was prepared in a 14-point Century Schoolbook proportional typeface, in compliance with Fed. R. App. P. 32(a)(5)–(6). Pursuant to Fed. R. App. P. 29(a)(4)(G) and 32(g), I certify, based on the word-counting function of Microsoft Word, that this brief complies with the type-volume limitations of Rule 29(a)(5), in that the brief contains 5,302 words, including footnotes but excluding portions of the brief that are not to be counted, which is less than half the allowable length of a party's principal brief.

/s/ Gordon D. Todd
Gordon D. Todd
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000

*Attorney for Amicus Curiae the Jewish Coalition for Religious Liberty and Agudath Israel of America*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>/s/ Gordon D. Todd</u>
Gordon D. Todd
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000

*Attorney for Amici Curiae the Jewish Coalition for Religious Liberty and Agudath Israel of America*

30

265595266

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __20-2185__     Caption: __Canaan Christian Church, et al v. Montgomery County, Maryland, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Jewish Coalition for Religious Liberty__
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:


5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:


6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.


7.   Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.


Signature: ___/s/ Gordon D. Todd_____        Date: _____3/15/2021_____

Counsel for: __Amicus_____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 20-2185     Caption: Canaan Christian Church, et al v. Montgomery County, Maryland, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Agudath Israel of America
(name of party/amicus)

who is _____ amicus _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _/s/ Gordon D. Todd_____     Date: _____3/15/2021_____

Counsel for: _Amicus_____

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## APPEARANCE OF COUNSEL FORM

**BAR ADMISSION & ECF REGISTRATION:** If you have not been admitted to practice before the Fourth Circuit, you must complete and return an Application for Admission before filing this form. If you were admitted to practice under a different name than you are now using, you must include your former name when completing this form so that we can locate you on the attorney roll. Electronic filing by counsel is required in all Fourth Circuit cases. If you have not registered as a Fourth Circuit ECF Filer, please complete the required steps at Register for eFiling.

**THE CLERK WILL ENTER MY APPEARANCE IN APPEAL NO.** 20-2185 _____ as

☑ Retained  ☐ Court-appointed(CJA)  ☐ CJA associate  ☐ Court-assigned(non-CJA)  ☐ Federal Defender

☐ Pro Bono  ☐ Government

COUNSEL FOR: Jewish Coalition for Religious Liberty and Agudath Israel of America

_____ as the
(party name)

☐ appellant(s) ☐ appellee(s) ☐ petitioner(s) ☐ respondent(s) ☐ amicus curiae ☐ intervenor(s) ☑ movant(s)

/s/ Gordon D. Todd
(signature)

**Please compare your information below with your information on PACER. Any updates or changes must be made through PACER's Manage My Account.**

| | |
|---|---|
| Gordon D. Todd | (202) 736-8000 |
| Name (printed or typed) | Voice Phone |
| Sidley Austin LLP | (202) 736-8711 |
| Firm Name (if applicable) | Fax Number |
| 1501 K St, NW | |
| Washington, DC 20005 | gtodd@sidley.com |
| Address | E-mail address (print or type) |

**CERTIFICATE OF SERVICE** *(required for parties served outside CM/ECF)*: I certify that this document was served on _____ by ☐ personal delivery; ☐ mail; ☐ third-party commercial carrier; or ☐ email (with written consent) on the following persons at the addresses or email addresses shown:

_____          _____
Signature                                              Date

1/28/2020  SCC